Ms. McKee, would you announce our first case for argument, please? The first case for argument, case number 24-1728 from the District of Minnesota, Amity Dimock v. City of Brooklyn Center, et al. And Mr. White? May it please the court, counsel, my name is Kenneth White. I'm an attorney from Mankato, Minnesota, and I'm here today representing Amity Dimock, the trustee for the heirs and next of kin of her son, Kobe. I will, consistent with the district court labeling, use first names. I know that's not normal, but the district court chose to do it and I thought it was probably easier in terms of keeping track of everything if I did the same. Kobe Dimock was shot four times in the back and then once more to the head, leaving stippling, back of the head, leaving stippling. This situation arose out of a call by his grandfather to the Brooklyn Center Police Department, asking for assistance in dealing with Kobe, who had pulled out a knife and a hammer in a dispute with his grandfather. Twice, Mr. grandfather tried to stop the police from coming in calls to dispatch. And when the police arrived, he met them outside and again reported to them that they should not be allowed to enter. On appeal, he did say, okay, he's the officer that we got to make sure everybody's okay. And he says, okay, and goes back in the house. That's correct, your honor. The critical point here in terms of consent is that consent cannot be in response to an assertion of authority. And here the officer did not say, may we come in? We would like to come in. Our policy says we're supposed to come in. The officer said, we must come.  We got to. Got to. That's different. That's an assertion of authority. That's an assertion that I have the lawful right to enter your house, whether you like it or not. And at that point, grandfather responded and said, okay, turns and walks to the house. But even if we step beyond that initial conversation and whether that is sufficient to get to consent, which I would submit to this court, it's not. The undisputed facts, or at least the facts taken in a light most favorable to the appellant here, demonstrate that there was no consent given. What do we know as a matter of fact? We know that there were at least the two phone calls and there's a dispute between the videotape or the officer's body worn camera video and the statement of both grandfather and officer Akers. That grandfather and officer Akers both testified in their depositions that grandfather said, do not come in. I don't want you here. The body worn camera doesn't seem to support that, but I would submit that that raises at least a fact question for the jury to resolve about whether the camera caught everything because those things are not perfect and they don't catch every conversation. Why weren't there accident circumstances? I mean, we have cases talking about the volatile, dangerous nature of domestic abuse situations, or at least what police may have believed was a domestic abuse situation. We have, you know, we've had cases where alleged victims, you know, de-emphasize what happened and don't want it addressed. And what is unreasonable about the officer saying, look, we need to make sure things are okay? And why wasn't that an accident circumstance that justified entry into the home? Well, your honor, I think there are a multitude of responses and flaws in that analysis that the appellees make here. First of all, the case law in this circuit is quite clear and across the country, I would submit, is quite clear that there must be a danger to self or others, an imminent threat. It's not just a suspicion. It's not a guess. The officers have to have some articulable basis upon which to go in. What do we know the officers knew as they approached the scene? We know that they knew that the call had been attempted to be canceled twice. That's in the call logs. We know that the officers approached and were met outside by grandfather. We know that grandfather either implied or expressly stated, I don't want you coming into my house. We know for sure that he said everything is OK. He's given up the weaponry. We don't have an issue any longer. But he also said they had been threatened with a knife and a hammer. And grandma was still in there, right? He he acknowledged that, yes, that there were grandma was still in there, but that he also said Kobe is no longer armed. And he expressly told the officers that he's given up the weapons. So we have an unarmed individual with a relative unarmed, but access to arms. Theoretically, certainly. We know that Irwin grandfather had attempted to cancel the call. We know Irwin did not rush out, help me, help me. When the police arrived, he comes out very calmly and we also know about a past situation, though, where he had hurt himself with a knife. Right. Yes. Two of the at least two of the officers were aware of the past incident where Kobe had stabbed himself with a knife. Yes. But again, I don't know that the officers knew. The situation which they confronted on that particular date was one where Irwin grandfather had had the opportunity to talk to the officers. The officers had the opportunity to ask some questions, to evaluate the situation further. They did not do that. They simply asserted, we have to come in. Grandfather says, OK, Officer Akers makes it to the threshold. And then grandfather positions himself in this narrow space between the couch and the wall so that the officers can't go past. Two of the officers simply push past Officer Akers and push past grandfather as they storm into the house. We know in terms of exigent circumstances that the officers were able to hear noise from inside. Because as they're approaching, one of the conversations is, be careful, they can hear us because the windows are open. It's a nice, nice day. They don't hear any noise from inside. There's no screaming. There's no hollering. There's no argument. There's no discussion. There's absolute silence from inside the house. And so we have this situation where the officers are presented with a situation where there is no, I would submit, or at least as a matter of law, but certainly there is no, as a factual dispute, an exigent circumstance because there is nothing to demonstrate that there is a present danger to either the officers, clearly not, they're not in the house, or others. And so it's that lack of an exigent circumstance, that lack of consent, that we believe creates the First Amendment or the Fourth Amendment violation for the illegal entry. I'm down to 18 seconds and I'd hope to save two minutes for rebuttal. So I think what I'll do is I'll just keep going because I do want to talk about the deadly force claim. It may burn through my time and I'll run that risk. As to the deadly force claim, that presents a rather interesting case and I would submit that this court's decision in Marks back in July of, I think June or July of this year, gives you a very similar factual pattern here which creates a fact issue. And Marks is at 107 F. 4th, 840. There, this court addressed the situation of a crowd and a person who had been pushed away from a police officer and then is shot with a projectile in the face. Similarly here, what do we have? We have Kobe attempting to get up and run. What does Officer Vu tell us? He never tried to attack me in any way. He was simply trying to escape. He didn't punch me. He didn't kick me. Took no offensive action against me at all. He was simply trying to escape. We have... Well, he did reach for a knife and got a knife and that knife was waving in the face of another officer. Well, that's the officer's allegation, Your Honor. And even the district... I saw that on the video. Well, even the district court recognized that there's a factual dispute about what the video shows and what it doesn't show. In terms of whether Kobe actually took the knife and waved it offensively or was simply trying to stand up at the time. And that's what caused the knife to be moving around. So we may not know what was in Kobe's head, but we know the knife was waving. And we know that Grandma did not see any offensive use of the knife as she was observing everything that was going on in front of her. So we have this situation of Grandma observing the events and saying there's nothing offensive going on. The officer's finding something offensive going on. Officer Vu telling us there was nothing offensive going on from his perspective as he tried to tackle Kobe. And that creates the fact issue in terms of the use of deadly force here. So I would ask on behalf of my client that this court reverse and remand on both claims. Thank you very much. Mr. White, I'll give you a couple of minutes in rebuttal. I appreciate that very much, Judge. Ms. Ramstad. May it please the court, counsel. My name's Ashley Ramstad and I'm here on behalf of the appellees. I'd like to go straight to something Mr. White stated in his argument that the record is not clear or doesn't support that Mr. Heisler did set. I apologize, Your Honor. The record does not show that Mr. Heisler told the officers that they weren't able to come in. It's not on the video. And in fact, he does cite to the depositions. But I believe Mr. Aker's deposition testimony specifically was, I think he said something to the effect of, I think everything is going to be fine now. Which is what the video shows. What was the grandfather's testimony in deposition? Your Honor, when asked, the grandfather's testimony was, I came outside the house to greet them and to meet them and to tell them not to come in. So that might have been his subjective belief that that's what he was going to tell them. But the video does not show him ever saying you cannot come in. So do we know definitively that the video captured everything that that occurred? Your Honor, all four officers' body camera video starts as soon as they get the call. When they're in their squad vehicles and they've never been turned off. They captured the entire incident. And there's nowhere in that video that Mr. Heisler tells them you can't come in. I would also note that the district court stated that although he testified in his deposition, Mr. Heisler stated that he didn't want them to come in. Those are his subjective opinions. And the district court correctly analyzed his actions of consent through objective behaviors that Mr. Heisler gave that day. And what the officers, experienced officers, objectively believed that they had reasonable consent to enter the house. Well, he consented or didn't, but he consented under your theory after he received what he may have understood as a lawful order or an unlawful order. But he received an order from the police, basically, we're coming in and he acquiesced to that. Isn't that different than the other cases we've had? I mean, there is a difference, is there not, between the officers arriving and saying, may we come in? And we are coming in. Your Honor, the video does not show Mr. or Officer Akers stating we need to come in. Well, he says we got to make sure everyone's OK before we leave, which the clear implication is we're coming in there, isn't it? Or do you disagree with that? I mean, I disagree. And I would also point to the fact that Mr. Heisler states, OK, and says he understands and then starts walking towards the door, which is more similar to the cases where it's implied consent because he kept the door open and and walked in with the officer that came after what could be argued is an order. Right. I mean, otherwise, I mean, he was being cooperative in his his view at that point after being told what's going to happen. I don't know that that that he should be faulted for that. Your Honor, I would distinguish it from the case, United States v. Hatcher, because in that case, they found that the officers didn't have consent because the officers, as they stated, their lawful authority to enter immediately began entering. Didn't give her any moment or opportunity to say no or do anything otherwise. They simultaneously entered the door. Whereas here, I think there was an obligation on the grandfather to object. Your Honor, his actions to an objective, reasonable officer imply that he was giving consent for them to enter. I would say that that's the big difference between this case and Hatcher, that his actions following he not once refused or objected to it. The doors were closed. He came out to greet them. There's two screen doors. He closed both of them. After this, he walked up to the door, announced to Mr. Dimock or Kobe and Susan, the grandmother, that they were going to come in and make sure everything was OK. So there are facts here that are very specific and different from those in Hatcher that would give a officer the reason to believe that he had consented to their entry. I'd like to move on to the deadly force claim. So here, the district court correctly found that the officers were reasonable in their use of force because Kobe did present an imminent threat to himself, his grandmother and the officers. This was a very highly volatile situation, although it started out as calm. This is a situation where not only did he refuse officers commands. He had been accused of assault with a deadly weapon, not listening to officers commands, was fleeing and armed himself while he was in a tussle with officers. Now, I know the district court found there's a dispute whether he was pointing the knife at the officers or not, but the district court correctly found that that was immaterial because the fact of the matter is he had a knife, was refusing to listen to the officers and was within feet of officers and his grandmother, making him an imminent threat to those around him with the knife. His subjective opinion or belief of what he was going to do with that knife doesn't matter for the analysis. I'd also like to address Mr. White's provocation theory that the officers created this dangerous situation for themselves. However, as we stated in our brief, the United States Supreme Court has stated that that's not the right analysis, is an illogical expansion of Graham and should not be applied here. It does not matter what led up to the seizure. It matters what occurred at the time that they used that force and what was known to the officers. What was known to the officers, Your Honor, was that he was holding a knife. And it's important to note that that knife was red, so Officer Akers stated that he thought Kobe had actually already stabbed somebody because it looked bloody. So when he used his deadly force, he was under the belief that Kobe had already stabbed an officer himself and would potentially stab another officer. So there was an imminent threat of harm to Kobe, the officers, and his grandmother in that situation, which justifies the officer's use of force in this case at that moment. I'd also like to distinguish Marks v. Bauer. I am familiar with the case, Your Honor. Those facts just don't apply here. In that case, it was a protest. The plaintiff got upset because his mother was trying to enter a crowd where someone had been stabbed. An officer told them to leave. He got upset and made some gestures towards one officer. Now, Officer Bauer had thought that he was going to assault that officer. However, the officer that he thought, Officer Bauer thought the other officer that was going to get assaulted by Marks testified that he was no longer in harm. He'd already pushed Marks far enough away from him that he couldn't cause him any harm and that he was no longer approaching the officer. Here, this is an ongoing fight that's occurring and Dimmock is not listening to the officer's commands. He's continuing to resist. He's continuing to fight. And unlike the plaintiff and Marks, he has a weapon. I believe I remember correctly that the plaintiff and Marks did not have a weapon. The officer only thought he was going to assault somebody with his body and the force of his movement. Your Honor, I finally would like to go back to the exigent circumstances because I haven't touched on that yet. I would say that there were exigent circumstances regardless of what the officers approached when Mr. Heisler came out to greet them. And that's for several reasons. This court has made it clear that officers don't have to listen to a victim of domestic assault and believe them that everything's okay when they arrive after getting a domestic assault call. They also only had the knowledge from the victim that Dimmock was no longer armed. They did not know that. And Dimmock was in the house with his grandmother. This is very much like Cotton v. Miller, which we testified to that if there is a suspect of domestic violence in the house with potential weapons and the victim is still in the house, that creates exigent circumstances. Mr. White argues that he was unarmed. There was no longer any exigent circumstances. However, we did not argue that the mere presence of a weapon gave the exigent circumstances. It's what was known to the officers. They arrived after a domestic assault call that Kobe had assaulted or threatened his grandfather with a hammer and knife. They then knew that he was still in there with his grandmother and could potentially cause harm to her. And as the record makes clear, there were multiple weapons throughout the house. The officers needed to investigate that to make sure that Dimmock was no longer armed, Your Honor. And with that, I will finish. Very well. Thank you. Mr. White, as I said, it's an important case and we'll give you a couple minutes of rebuttal. Thank you again, Your Honor. I appreciate the courtesy. Just a couple of points. First off, this court asked if Irwin had an obligation to object to the officer. This court's case law says no. There is no obligation to verbally object when an officer asserts authority or seeks consent. Second, in terms of the consent, I think it's important that this court pay attention to what the district court found. And the district court expressly found that, in fact, the officer had made a demand, not a request. And that's a significant difference in this court's case law that stood for quite a while. I mean, we go back at least a decade in that case law. In terms of the exigent circumstances, Your Honors, counsel relied on Cotton. Cotton is a very, very different case in that the only conversation there was through a door, with no indication that anybody had left the building or left the apartment. And the officers knew that there was a child there who was at risk. So I don't think that Cotton applies. And, in fact, the distinctions from Cotton demonstrate that there were no exigent circumstances. Here, given what the officers knew and what the officers had the opportunity to find out before they entered the house. And, finally, counsel relies on, in terms of the deadly force, a couple of things. First of all, the provocation theory. We've never asserted a provocation theory in this court. I don't assert it today. I would note, however, that this court in Ludwig at 54 F3rd 465 indicated that provocation does play a part in the analysis. That it reduces the fundamental or it increases the fundamental right and it reduces the necessity of the police to go in. And I also think this court needs to pay attention to Colby's body position out of the videotape as this incident occurs and immediately before he was shot. So, again, I would ask that this court reverse and remand to the district court for further proceedings. Thank you very much. Very well. The court wishes to thank both counsel for their argument and appearance. The case is submitted and we will issue an opinion in due course.